THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v. GARET L. FOX, Defendant-Appellee.
Fifth District   No. 5—88—0624

Opinion filed August 17, 1990.

Sherri L.E. Tungate, State's Attorney, of Louisville (Kenneth R. Boyle, Stephen E. Norris, and Ellen Eder Irish, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

K. Scott Wilzbach, of Salem, for appellee.

JUSTICE HARRISON delivered the opinion of the court:

The defendant, Garet Fox, was charged with unlawful use of weapons. (Ill. Rev. Stat. 1989, ch. 38, par. 24—1(a)(4).) Mr. Fox filed a motion to suppress his arrest and evidence seized, and following a hearing, the trial judge granted the motion. The State appeals pursuant to Supreme Court Rule 604(a)(1) (107 Ill. 2d R. 604(a)(1)). We affirm the trial court.

At the hearing on the motion to suppress, Mr. Fox testified that on July 28, 1988, at approximately 10:30 a.m., he was riding his motorcycle, traveling eastbound on U.S. Highway 50 in Clay County, Illinois, when he was stopped by an Illinois State Trooper for speeding. Fox accompanied the officer to his squad car, where he wrote Fox a speeding ticket. Before Fox entered the squad car, the officer took from Fox a hunting knife which he carried in a leather sheath on his belt. After writing the speeding ticket, the officer returned Fox's knife and Fox proceeded eastbound on Highway 50. Fox noted that the officer continued to follow him, leaving his red lights on for a short time and then shutting them off.

After Fox had traveled two or three miles, the officer pulled up beside him flashing his headlights and motioned for Fox to pull over to the side of the road. The officer exited his vehicle and approached Fox, who asked what the officer wanted. Fox testified that "by then [the officer] was up there and he grabbed my arm and up under my vest and started \*\*\* reaching, grabbing." The officer removed a pistol from the waistband of Fox's pants and then placed him under arrest.

On cross-examination, Mr. Fox stated that on the day of his arrest he was wearing a short leather vest which covered his belt. He had unbuttoned the vest while seated in the squad car and had rebuttoned it, making it fit more snugly, as he mounted his motorcycle to leave. Fox admitted that he could have put his hand behind his back as he was traveling, stating: "I could have put it back to more or less put my vest down and my pants up. After you get situated on the road and you get along, you need to get your clothes where the air don't [sic] blow in them."

Trooper Greg Miller of the Illinois State Police testified that he was the officer who wrote Mr. Fox a speeding citation on July 28. As Fox approached the patrol car, he pulled a hunting knife in a sheath attached to his belt around to the front of his body. Officer Miller took the knife from Fox before allowing him to enter the patrol car. While writing the speeding citation, Miller noticed Fox tug at his vest three times as he sat in the patrol car. Miller stated, "I was somewhat curious but I didn't feel at that time I had reason enough to go ahead and search his person."

Officer Miller gave the following explanation for stopping the defendant the second time:

"After [Fox] got out of my vehicle, I was curious so I watched his movements. After he got out of the car, he buttoned his vest up and it made it snug around his waistband. I noticed a small bulge on his waistband on the rear left side and that made me even more curious, but it wasn't large enough to be what I perceived to be a gun. At that time, he got back on his motorcycle and I followed him between a quarter and an eighth of a mile. It wasn't a long distance. After he got on the motorcycle, he reached back to the spot where the bulge was and did what I do when I carry my weapon off duty to adjust it so it is less visible for a period of probably three to four seconds, and that's when I decided to stop him again and check the area."

Miller testified that he "felt reasonably sure" that Mr. Fox possessed a weapon prior to stopping him the second time.

After pulling Fox over, Officer Miller approached the motorcycle. Miller testified that he told Fox that "he hadn't done anything wrong the second time, but from the actions that he did in my car, it made me nervous." Miller then placed his hand on Fox's waistband and felt a weapon, which he removed. Miller searched the pockets of Fox's vest and found a small pouch containing ammunition for the gun. Officer Miller stated that at the time he searched Fox, he believed Fox to be dangerous because Fox had earlier told him that Fox was carrying a knife because he was going to pick up a truck for a friend, and he "expected some trouble." On cross-examination, Miller admitted that as he was driving Fox to the jail following his arrest, he told Fox that when he pulled him over the second time, he was hoping Fox would run or try to elude him.

Following argument by counsel, the trial court stated, in part, as follows:

"The issue in this case is was there a reasonable suspicion sufficient to justify the second stop of the Defendant under *Terry*. \*\*\* It is clearly not a continuation of the original stop. \*\*\* You have to look at the facts at the time prior to the discovery of the weapon to see whether there was reasonable cause to justify the intrusion on the Defendant's person. \*\*\* I don't believe the additional conduct on the part of the Defendant after the [original] stop gave the officer sufficient *Terry* grounds to make the subsequent stop. So, the Motion to Suppress is granted."

A reviewing court will not disturb a trial court's finding on a motion to suppress unless that finding is manifestly erroneous. (*People v. Reynolds* (1983), 94 Ill. 2d 160, 165, 445 N.E.2d 766, 769.) Under the facts of this case, the trial court was not manifestly erroneous in sustaining Mr. Fox's motion to suppress.

Initially, we note that the trial court was correct in viewing Officer Miller's second stop of Mr. Fox as an incident separate and apart from the original and legitimate stop for a traffic violation. Clearly, Officer Miller would have been justified in conducting a pat-down search for weapons in connection with the traffic arrest under the circumstances of this case. (See *People v. Kantowski* (1983), 98 Ill. 2d 75, 81, 455 N.E.2d 1379, 1382 (protective frisk for weapons proper when driver stopped for speeding observed by officer to be in possession of knife); see also *People v. Gunsaullus* (1979), 72 Ill. App. 3d 440, 443, 391 N.E.2d 142, 146.) However, once that transaction was completed and Mr. Fox was allowed to leave, these safety considerations were no longer relevant and any further intrusion on Mr. Fox's fourth amendment right of privacy must have been separately justi-

fied. See *Terry v. Ohio* (1968), 392 U.S. 1, 20-21, 20 L. Ed. 2d 889, 905, 88 S. Ct. 1868, 1879.

■■ Illinois has codified the *Terry* rules relating to stop and search situations. These statutes provide in pertinent part:

"A peace officer *** may stop any person in a public place for a reasonable period of time when the officer reasonably infers from the circumstances that the person is committing, is about to commit or has committed an offense *** and may demand the name and address of the person and an explanation of his actions." Ill. Rev. Stat. 1989, ch. 38, par. 107—14.

"When a peace officer has stopped a person for temporary questioning pursuant to Section 107—14 of this Code and reasonably suspects that he or another is in danger of attack, he may search the person for weapons." Ill. Rev. Stat. 1989, ch. 38, par. 108—1.01.

■■ A police officer's conduct in a stop and search situation must be governed by the standard of reasonableness. (*People v. Byrd* (1977), 47 Ill. App. 3d 804, 807, 365 N.E.2d 443, 445.) In determining the reasonableness of the stop and subsequent search in the instant case, our inquiry is directed to "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Terry*, 392 U.S. at 20, 20 L. Ed. 2d at 905, 88 S. Ct. at 1879.

In order to justify the second stop of Mr. Fox in the case at bar, Officer Miller had to "point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." (*Terry*, 392 U.S. at 21, 20 L. Ed. 2d at 906, 88 S. Ct. at 1880.) In *Terry*, the court found that the officer's observation of the defendant and his companions walking up and down the same street and repeatedly peering into a store window warranted a reasonable suspicion by the officer that a crime was about to be committed. The court therefore held that the officer's detention of the defendant was proper under the circumstances.

Here, the State contends that, as in *Terry*, the police officer "observed *** a series of acts, each of them perhaps innocent in itself, but which taken together warranted further investigation." *Terry*, 392 U.S. at 22, 20 L. Ed. 2d at 907, 88 S. Ct. at 1880-81.

However, the situation in the present case is distinguishable from that in *Terry*. It was the numerous repetitions of the otherwise innocent behavior observed in *Terry* which justifiably aroused the suspicions of police. Here, however, by Officer Miller's own admission, Fox's act of tugging at his vest three times as he sat in the patrol

car, while making Miller "somewhat curious," did not give him "reason enough to go ahead and search [Fox's] person." Similarly, Miller discounted his observance of a small bulge at Fox's waistband because it "wasn't large enough to be what I perceived to be a gun."

It was only after following Mr. Fox some distance on the highway and seeing him reach behind to the area of the bulge in his vest and make an adjustment that Officer Miller decided to "stop him again and check the area." Miller testified that Fox's gesture was similar to what he himself did when adjusting his off-duty weapon to make it less visible. However, as the trial court stated, the gesture was "equally consistent with innocent behavior," *e.g.*, adjusting one's clothing for better wind resistance while riding. The officer's conclusion that Fox was carrying a weapon was therefore more a mere suspicion or hunch than a rational inference from the facts. Mere suspicions of the police are not sufficient to establish the reasonableness of a stop. *People v. Rizzo* (1977), 49 Ill. App. 3d 105, 107, 363 N.E.2d 100, 102; see also *People v. Long* (1983), 99 Ill. 2d 219, 228, 457 N.E.2d 1252, 1256.

In *Byrd* (47 Ill. App. 3d at 808, 365 N.E.2d at 446), the appellate court held that where a police officer's *Terry* stop of a defendant was unreasonable, the officer's subsequent search of the defendant pursuant to his observation of a bulge in the defendant's pants pocket was not permissible under the standards prescribed by section 108—1.01. (Ill. Rev. Stat. 1989, ch. 38, par. 108—1.01.) Similarly here, where Officer Miller's stop of Mr. Fox was unreasonable, his subsequent search for weapons was impermissible. In upholding the trial court's grant of the defendant's motion to suppress, the *Byrd* court stated: "We are keenly aware of the need for an alert and aggressive police force, intent on shielding the community from criminal conduct. However, security is never an absolute in a free society which abhors intrusions upon constitutionally guaranteed rights." (47 Ill. App. 3d at 808, 365 N.E.2d at 446.) We wholeheartedly agree.

For the foregoing reasons, the judgment of the trial court sustaining Mr. Fox's motion to suppress is affirmed.

Affirmed.

LEWIS, P.J., and GOLDENHERSH, J., concur.